**FILED**
**CLERK**

11/25/2015 1:33 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DR. OGINA HAILOO,

                           Plaintiff,

    -against-

DISABILITY RMS, FIRST UNUM LIFE
INSURANCE COMPANY,

                       Defendants.
------------------------------------------------------------------------x

**MEMORANDUM OF**
**DECISION AND ORDER**
14-cv-1992(ADS)(ARL)

## APPEARANCES:

**The Law Office of John F. Clennan, Esq.**
*Attorney for the Plaintiff*
P.O. Box 1143
2206 Ocean Avenue
Ronkonkoma, NY 11779

**McElroy, Deutch, Mulvaney & Carpenter LLP**
*Attorneys for the Defendants*
P.O. Box 2075
1300 Mount Kemble Avenue
Morristown, NJ 07962
        By:    Randi F. Knepper, Esq.
              Janet Nogotko, Esq., Of Counsel

**SPATT, District Judge:**

On March 28, 2014, the Plaintiff Dr. Ogina Hailoo ("Dr. Hailoo" or the "Plaintiff") commenced this action against the Defendants Disability Reinsurance Management Services, Inc. ("DRMS") and First Unum Life Insurance Company ("First Unum", together with DRMS, the "Defendants"), seeking to recover benefits under a policy of disability insurance and related relief.

Presently before the Court is a motion by the Defendants, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, for summary judgment dismissing the complaint.

Before turning to the merits of that motion, the Court notes that the Plaintiff submitted a document entitled "Civil Action – Rule 56.1 Statement in Opposition to Defendant's [*sic*] Motion for Summary Judgment and in Support of Summary Judgment for Plaintiff" ("Pl. 56.1 Opp").  However, despite the indication in its title that this document is submitted in support of summary judgment for the Plaintiff, the Court notes that Dr. Hailoo did not file a notice of cross-motion.  Consequently, the Court does not recognize any portion of her filing as a request for such affirmative relief.  <u>See</u> Local Civil Rule 7.1(a)(1) (requiring all motions to include, among other things, a notice of motion).

## I.    Background

Unless otherwise noted, the following facts are undisputed and are construed in favor of Dr. Hailoo.

Dr. Hailoo is an individual residing in Suffolk County, New York.  At all relevant times, she was a practicing dentist; the sole owner of a dentistry practice in Farmingdale; and a member of the Nassau/Suffolk Physicians Guild (Dental) (the "Dental Guild").

## A.    The Disability Insurance Policy

First Unum issued a group policy of disability insurance to the Dental Guild, for which the Defendant DRMS acted as the claim administrator.  In this regard, in

or about 1990, a Disability Income Policy of insurance (the "Policy") was issued by

First Unum to Dr. Hailoo.  The following provisions of the Policy are at issue in this

case:

## Maximum Benefit Periods

The Monthly Benefit will continue to be paid as long as You meet the benefit requirements stated above.  However, the period of payments will not exceed:

**For Accidents**
1) Your lifetime, if disability starts prior to age 60;
2) Your 65th birthday, if disability starts on or after age 60, but prior to age 63;
3) 24 months, if disability starts on or after age 63.

**For Sicknesses**
1) Your lifetime, if disability starts prior to age 50;
2) Your 65th birthday, if disability starts on or after age 50, but prior to age 63;
3) 24 months, if disability starts on or after age 63.

\*       \*       \*

## Definitions

. . . Total Disability means: (1) You are unable to perform the substantial and material duties of Your occupation due to an Injury or Sickness; and (2) You are receiving regular medical care from a duly licensed physician other than Yourself.  . . .

Injury means a loss or disability which is a direct results [*sic*] of bodily injury caused by an accident which occurs while this Policy is in force and is independent of all other causes.  The Loss or disability must commence within 365 days of the accident; otherwise, it will be considered as arising from a Sickness.

Sickness means a sickness or disease which causes loss or disability commencing while the Policy is in force.

<u>See</u> Exhibit "A" to the May 26, 2015 Affidavit of Lynn Lamson (the "Lamson Aff.").

It is undisputed that the Policy provided for a monthly disability benefit of $2,000.  <u>See</u> 56.1 Stmt. ¶ C.6.

Dr. Hailoo asserts that, at the time she purchased the Policy, she was provided with a summary of declarations.  <u>See</u> June 26, 2015 Affidavit of Dr. Ogina Hailoo ("Pl. Aff.") ¶ 13.  This purported summary is contained in a two-page document entitled "Application for Disability Insurance Income," which is in the record as Exhibit "A-2" to Plaintiff's 56.1 Opposition.  However, the Court notes that this application was completed by one "Eugen N. Hailoo."  There is no evidence that Dr. Ogina Hailoo is also known as, or ever went by the name of, Eugen N. Hailoo.

Nevertheless, this document contains the following information, which the Court has reproduced, in relevant part, below.  The underscored portions of this chart are handwritten in the original document.

| For Company Use | Coverage Summary Section |
|---|---|
| Policy No. RXR <u>37131</u> | Effective Date <u>3-8-90</u> |
| Initial Premium $<u>393.80</u> | Renewal Term <u>6</u> |
| Maximum Benefit Period | First Renewal Premium Due Date <u>9-1-90</u> |
| Accident <u>Lifetime</u> | First Renewal Premium $<u>406.00</u> |
| Sickness <u>Lifetime</u> | Billing Mode ___ Annual <br> <u>x</u> Semi-Annual |

<u>See</u> Pl. 56.1 Opp., Ex. "A-2."

Dr. Hailoo asserts that, notwithstanding the portions of the Policy quoted above, this summary of declarations accurately reflects the coverage that she believed she would be receiving under the Policy, namely, "lifetime benefits for both sickness and accident."  <u>See</u> Pl. Aff. ¶ 14.

Similarly, Dr. Hailoo relies upon a document of unspecified origin, which is undated and was created on the letterhead of an entity known as Endorsed Administrators, Inc. and/or J.J. Jerome Associates, Inc. <u>See</u> Pl. 56.1 Opp., Ex. "A-3." No attempt is made by Dr. Hailoo to authenticate this document, other than to describe it as a "letter [she] received on the subject." <u>See</u> Pl. Aff. ¶ 15. There also is no information from which the Court can determine what role, if any, Endorsed Administrators, Inc. and/or J.J. Jerome Associates, Inc. have in this case. Under these circumstances, the admissibility of this document is questionable.

Nevertheless, this document, which was sent via fax from one Anna Russo to a representative of Unum Associates Benefits, purports to outline the relevant terms of the Policy and denotes the "benefit period" as "L/L." Dr. Hailoo asserts that "L/L" means "Lifetime Limitation," although no basis is given for her conclusion in this regard and there is no evidence in the record relating to the meaning of "L/L."

**B.    The Plaintiff's Injury and the Initial Medical Consultation**

Dr. Hailoo asserts that, in or about July 2000, she underwent surgery for carpal tunnel syndrome. The Court will take judicial notice that "[c]arpal tunnel syndrome is 'a condition caused by compression of the median nerve in the carpal tunnel and characterized especially by weakness, pain, and disturbances of sensation in the hand and fingers.'" <u>Hilsdorf v. Comm'r of Soc. Sec.</u>, 724 F. Supp. 2d 330, 353 n.13 (E.D.N.Y. 2010) (quoting *Merriam-Webster's Medical*

*Dictionary*, Carpal Tunnel Syndrome, <u>available at</u>, http://www.merriam-webster.com/medical/carpal%20tunnel%20syndrome (last visited Nov. 25, 2015)).

Dr. Hailoo asserts that she made a full recovery from her carpal tunnel surgery; that she was thereafter asymptomatic; and that she returned to practicing dentistry without limitation. <u>See</u> Pl. Aff. ¶¶ 17-18.

However, on May 2, 2002, an incident allegedly occurred while Dr. Hailoo was extracting a patient's tooth (the "2002 Incident"). The Court notes that, in using the term "incident," it is not expressing an opinion as to whether the referenced event constitutes an "accident" within the meaning of the relevant Policy language, quoted above.

Dr. Hailoo describes the 2002 Incident as follows:

> Upon attempting to excise the tooth, I unexpectedly found the tooth was impacted, a condition I had not anticipated. I used all my strength to yank or wrench the tooth out. The tooth wouldn't budge. I suddenly felt a sharp pain in my right wrist. I heard a click sound in my right wrist. I lost balance and fell on my right hand. Rising, I did try to finish the extraction, but felt a "Clicking" of my right wrist under my thumb so I could not complete the extraction.

<u>Id.</u> ¶¶ 20-22.

Following the 2002 Incident, Dr. Hailoo asserts that she could not perform her duties as a dentist. Initially, she believed that her symptoms – which included swelling, numbness, and weakness in her right hand – would subside without the need for medical treatment. Rather than visit a physician, Dr. Hailoo asserts that, immediately following the 2002 Incident, she tried to ease her workload by hiring two dental assistants and a billing professional to help with the practice.

Eventually, on or about August 5, 2002, approximately three months after the 2002 Incident, Dr. Hailoo was examined by one Dr. Shafi Wani, a neurologist. In a related report, Dr. Wani stated as follows:

> The patient states she became acutely symptomatic with right hand symptoms of pain, numbness and night paresthesias about two and a half years ago. The patient states, subsequently, she was diagnosed as having carpal tunnel surgery [*sic*]. The patient had carpal tunnel release surgery about two years ago. The patient states she had significant improvement in acute symptoms. About three months ago, the patient fell on her right hand with the thumb being hyperflexed during the trauma. The patient states, subsequently, she has had recurrence of hand symptoms of pain, numbness and weakness. The patient states she is experiencing difficulty at work because of weakness of her wrist and has had problems extracting teeth.

Pl. 56.1 Opp., Ex. "G."

The report indicates that Dr. Wani's initial clinical assessment was "[r]ight wrist and hand pain post status carpal tunnel surgery" with "[e]vidence of right trapeziometacarpal joint dysfunction." The doctor noted that "[t]he possibility of recurrence of carpal tunnel syndrome cannot be ruled out." X-rays taken of Dr. Hailoo's right wrist on August 1, 2002 were noted to be normal. Further, Dr. Wani concluded that electrodiagnostic studies performed on Dr. Hailoo "reveal[ed] evidence of bilateral compressive carpal tunnel syndrome of moderate intensity."

The Court notes that this report indicates that Dr. Wani also performed a neurological examination and an electrodiagnostic examination of Dr. Hailoo's upper extremities. However, the results of those tests were reported separately and were not supplied to the Court.

Dr. Hailoo asserts that she was advised by Dr. Wani not to work. <u>See</u> Pl. Aff. ¶ 27. However, the evidence of this advice in the record is a series of three letters from Dr. Wani, dated July 14, 2003; July 28, 2004; and September 23, 2004. Each of these letters was prepared more than one year after the 2002 Incident, and states, in pertinent part, that Dr. Hailoo "*at this time* cannot return to . . . her regular work." <u>See</u> Pl. 56.1 Opp., Ex. "G-2" (emphasis supplied). In these letters, Dr. Hailoo's diagnosis is identified as cervical radiculopathy; carpal tunnel syndrome; and cervical myofascial pain.

According to Dr. Hailoo, she sold her dental practice and terminated all employment in or about November 2002, six months after the 2002 Incident.

## C.    The Plaintiff's Claim for Disability Benefits

On or about November 6, 2002, Dr. Hailoo made a claim for disability benefits under the Policy. A copy of the disability claim form (the "Claim Form") that she submitted to First Unum is in the record as Exhibit "C" to the Lamson Aff. The Claim Form states as follows:

Is this condition due to ☐ Accident ☐ Sickness?

Dr. Hailoo checked the box next to "sickness."

The Claim Form also instructs the claimant to "[d]escribe the injury incurred (what, how, where, when) or the nature and details of the sickness and when it began," to which the Plaintiff stated as follows:

Carpal tunnel Syndrome with symptoms including pain and tenderness, loss of power and inability to make a strong grip with numbness in both wrists, fingers, and palms. Also, pain and tenderness in the elbows and forearms.

Id.

Further, the Claim Form instructs the claimant to describe how her "injury or sickness impede[s] [her] ability to do [her] occupational duties," to which the Plaintiff stated as follows:

Pain, tenderness and loss of power in both upper extremities (elbows, forearms, wrist and hands) make it very difficult to hold and use dental instruments necessary to perform work as a dentist. Does not have the arm/hand power. Hard and painful to perform any twisting or repetitive movements, Wrist/hand swelling and pain limiting ability to use hands. Numbness during the entire day and pain especially at night make it very difficult to function properly at work. Surgical and conservative treatment have failed to improve the symptoms because of the continued overuse of the upper extremities at work and continued dental work will certainly worsen the condition and its associated symptoms.

Id.

The Court notes that Dr. Hailoo did not make mention of the 2002 Incident anywhere on the Claim Form. On the contrary, she specifically identified "[p]ain, tenderness and loss of power in both upper extremities (elbows, forearms, wrist and hands)" as the source of her inability to work. This is consistent with her deposition testimony in this case that, although only her right hand was allegedly injured in the 2002 Incident, the affliction of both hands by carpal tunnel syndrome is what rendered her disabled. See Exhibit "G' to the May 29, 2015 Certification of Randi F. Knepper, Esq. (the "Knepper Cert.") at p.55.

In fact, Dr. Hailoo testified that, at the time she completed the Claim Form, she did not believe the 2002 Incident was the cause of her disabling condition. See id. at pp.44-45. Rather, she testified that she believed her symptoms were the result of carpal tunnel syndrome. See id.

In connection with her claim for disability benefits, Dr. Hailoo also submitted a form entitled "Attending Physician's Statement," in which Dr. Wani similarly indicated that Dr. Hailoo's condition was due to a "sickness." See Lamson Aff., Ex. "D." Dr. Wani further stated as follows:

DIAGNOSES:
1. Failed carpal tunnel surgery, right hand.
2. Mild left carpal tunnel syndrome.
3. Bilateral trapeziometacarpal joint dysfunction.
4. Cervical disc disease associated with cervical radiculopathy.

OBJECTIVE FINDINGS:
Electrodiagnostic findings performed 08/15/02 (including monopolar needle electromyography, peripheral nerve conduction study and F-wave latency) revealed evidence of bilateral compressive carpal tunnel syndrome of moderate intensity, left slightly worse than right.

MRI of the cervical spine performed 11/21/02 revealed degenerative changes, particularly at C5-C6, which causes a moderate to adverse stenosis and some flattening of the spinal cord at that level, degenerative changes of the posterior element without a high grade spinal stenosis present in other levels and a small right disc suggested at C6-C7, possibly C7-TI.

SYMPTOMS: Neck pain and stiffness and marked pain in her left upper extremity with difficulty with motion and holding her left arm up. Bilateral wrist and base of thumb pain with difficulty with motion and difficulty gripping.

RESTRICTIONS:
Avoid repetitive wrist motion, especially flexion/extension and rotation type of activity. Avoid forcible pulling and pushing with her wrist. Avoid lifting and carrying weights over five pounds on a constant basis

with her hands.  Avoid use of tools in and instruments with vibrations in them.  Avoid excessive writing, typing and use of computer keyboard.

LIMITATIONS:
Based on patient's history, the patient cannot engage in physical activities of a dentist.

WORK STATUS:  The patient is classified as permanently totally disabled as a dentist.

Id.

Dr. Wani did not refer to the 2002 Incident in his supporting statement.  This omission was clarified by his deposition testimony.  Relevant here, Dr. Wani testified that Dr. Hailoo never told him that she injured her hand while extracting a patient's tooth.  See Knepper Cert., Ex. "H" at pp.10, 20 ("Q: At any time in 2002 did Dr. Hailoo advise you that she believed her symptoms were caused by an injury occurring in March 2002 when she was extracting a tooth?  A: No."); id. pp.26, 28 (stating that, over the course of 11 or 12 office visits in 2003, and 11 more visits in 2004, Dr. Hailoo never told him that she thought her symptoms were the result of an accident suffered while extracting a tooth).

When asked at his deposition whether it was his belief that Dr. Hailoo's condition was the result of a sickness and not an accident, Dr. Wani testified as follows:

> A:  Well, she had carpal tunnel surgery before she had the accident.  Carpal tunnel syndrome is a medical condition usually seen, mainly seen in females in their 40s, 50s, and 60s.
>     Then when you do the EMG on her test, you can see she has it on both sides.  So the condition was there.  What really happened when she fell, it just brought the symptoms back.  That's what that actually means because carpal tunnel syndrome

is not really caused by accident.

        The only time carpal tunnel syndrome is caused by an accident is when you break your wrist and it doesn't heal right. We believe it's mainly a disorder where you're born with a narrow tunnel in your wrist, and more [a] problem in females than in males. . . .

            \*      \*      \*

Q:  So it's your conclusion that the cause of her disability was carpal tunnel syndrome, correct?
A:  That's correct.
Q:  And that it preexisted any accident she may have had?
A:  Preexisted that fall, yes, and the accident just brought the symptoms out.
Q:  Is it your opinion that the cause of her disability or the cause of her condition was not the result of an accident directly and independently of all other causes?
A:  That's correct.

Id. at pp.14-15.

On December 11, 2002, Dr. Hailoo was interviewed by one Rachel Galena, a representative of First Unum, in connection with her disability claim. The minutes of that telephone interview are in the record as Exhibit "B" to the May 22, 2015 Affidavit of Sandra Giordano (the "Giordano Aff."). Relevant here, the minutes, which appear to have been taken contemporaneously by Galena on a boilerplate form, reflect the following:

**Is your disability the result of an accident or sickness?
<u>Sickness</u>**

  **2. Sickness:**
    a. What is the nature/diagnosis of the medical condition(s) causing your disability? **Cervical disc disease; carpal tunnel**

    b. When did you first start experiencing symptoms for the condition(s) described? **she had surgery about two years ago for her carpal tunnel she went back to work however she can't function anymore her physician has**

**advised that she does have nerve damage.** Please describe these conditions.

c.  Who first treated you for the symptoms described? **Dr. Richard Pearl**

If the policy is contestable, or if first manifest is an issue, question the insured accordingly based on answers to above questions.

*       *       *

**8. Review of Policy Provisions:**

. . . Maximum duration of benefits: **to 65**

Id. (emphasis in original).

The minutes of the December 11, 2002 telephone interview do not indicate that Dr. Hailoo advised Galena of the 2002 Incident.

Subsequently, on January 9, 2003, one Carol McNally, a Registered Nurse, conducted an in-person interview with Dr. Hailoo at the request of First Unum. McNally created a report on that same date (the "McNally Report"), which summarized the meeting. See Giordano Aff., Ex. "C." In relevant part, the McNally report stated as follows:

Dr. Hailoo reported that she first was diagnosed with bilateral carpal tunnel syndrome in the year 2000. Her neurologist at that time, Dr. Pearl, referred her to Dr. Hurst, an orthopedic hand specialist. Diagnostics and testing confirmed entrapment of the medial nerve on the right hand, and surgery was advised. This was performed on 7/25/02. Dr. Hailoo reported that after surgery, she had a reduction in the amount of pain and numbness she experienced, but she never obtained full resolution of her symptoms.

Since that surgery, she has experienced an increase in symptoms in her left hand, which includes weakness, numbness, hotness/burning, and pain. She reports a return of symptoms in her right (dominant)

hand as well. She also reports pain in her shoulders and neck. A MRI
diagnosed degenerative disc disease at the C5-6 level.

Id.

The McNally Report does not indicate that Dr. Hailoo advised her of the 2002
Incident.

According to the Defendants, on February 14, 2003, Dr. Hailoo's husband,
who is also a physician, contacted DRMS by telephone to inquire about the status of
his wife's claim for disability benefits. A handwritten memorandum memorializing
this telephone call is in the record as Exhibit "E" to the Giordano Affidavit. The
Court finds the handwritten memo largely illegible but notes that one particular
sentence, upon which the Defendants rely, is readable: "Dr. Hailoo told me that his
wife had failed surgery for carpal tunnel and currently has nerve damage." Id.

By letter dated March 12, 2003, DRMS identified itself to Dr. Hailoo as the
claims administrator for the Policy and advised that her disability benefits claim
had been approved (the "Approval Letter"). Relevant here, the Approval Letter
stated as follows: "We have approved your claims and instructed [First Unum] to
issue the initial disability checks. . . . [The Policy] ha[s] a maximum benefit period
to age 65 providing you continue to meet the definition of a disability." See Lamson
Aff., Ex. "B." There is no evidence that Dr. Hailoo objected to any information
contained in the Approval Letter.

**D.     The Plaintiff's Claim for Workers' Compensation Benefits and the 2003-04 Medical Consultations**

**1.     The Application for Workers' Compensation Benefits**

On or about April 11, 2003, approximately five months after Dr. Hailoo submitted a claim for disability benefits under the Policy, she also applied for Workers' Compensation benefits from New York State.  In her application for such benefits, Dr. Hailoo wrote the following explanation in response to the question, "How did injury/illness occur":  "repetitive injury from pulling tooth, drilling teeth, rotation, cleaning, vibration from vibrating tools, fillings, injections."  See Pl. 56.1 Opp., Ex. "D."

**2.     The Interim Medical Consultations**

**a.     Dr. Stephen M. Levin, M.D.**

The record contains a report by one Stephen M. Levin, M.D, the Medical Director of Mount Sinai Hospital's Irving J. Selikoff Center for Occupational and Environmental Medicine.  See Knepper Cert., Ex. "B."  The Court notes that Dr. Levin's report, which is dated July 21, 2003, does not identify the date on which he examined Dr. Hailoo.  In his report, he states, in relevant part, as follows:

> Dr. Hailoo was first diagnosed with bilateral carpal tunnel syndrome in June 2000, based on positive EMGs performed at that time.  Mild, bilateral cervical radiculopathy at C5-6 was also identified on the same study.  She underwent operative release of her right median nerve entrapment in July 2000 and was able to return to work 6 weeks post-operatively.
>
> Dr. Hailoo did well until May 2002, at which time she experienced recurrence of bilateral pain, numbness and tingling, and weakness in both hands, following a period of markedly increased clinical activity beginning in March 2002.  She also experienced forearm and elbow

pain, along with shoulder and cervicodorsal pain and stiffness at the same time. She described working unusually long hours, using both hands to grip instruments tightly, with wrists in flexed position. In August 2002, repeat EMGs demonstrated bilateral carpal tunnel syndrome, worse on the left. She was seen by a Dr. Wani, a neurologist, in September 2002, who obtained an MRI of her cervical spine that demonstrated C5-6 degenerative changes, with flattening of the cord. Dr. Wani declared Dr. Hailoo totally disabled for her work as a dentist, given the manual work-intensive character of her professional activities, and Dr. Hailoo has been unable to return to work since then. She continues to experience paresthesias, pain and weakness in both hands, worse after repetitive manual activity in performing household chores.

Id.

The Court notes that Dr. Levin's report does not indicate that Dr. Hailoo advised him of the 2002 Incident. Rather, Dr. Levin attributes the exacerbation of the Plaintiff's symptoms to "a period of markedly increased clinical activity." In fact, during her deposition in this case, Dr. Hailoo conceded that she had advised Dr. Levin that the cause of her wrist pain was "unusual long hours" and "using both hands to grip instruments tightly with [her] wrist in a flexed position." Id., Ex. "G." Based on these observations, Dr. Levin diagnosed Dr. Hailoo with bilateral recurrent carpal tunnel syndrome; exacerbation of cervical radiculopathy; bilateral trapezoid myositis; and bilateral medial and lateral epicondylitis. See id., Ex. "B."

### b. Dr. Mathew M. Chacko, M.D.

On July 22, 2003, Dr. Hailoo was seen by one Mathew M. Chacko, M.D., for an independent neurological evaluation. Dr. Chacko prepared a report which described Dr. Hailoo's medical history as follows:

Dr. Hailoo is a 54-year-old female who gives a history that she developed carpal tunnel syndrome as a result of repetitive use of her hand while working as a dentist. She said this was first diagnosed as bilateral carpal tunnel syndrome in June 2000 and had surgery on the right hand in July 2000 and said that the symptoms came back in 2002. She said the symptoms on the left side started in 2002, but she has not undergone any surgery for this. She said she has been under the care of Neurologist Dr. Wani and has also been evaluated by Dr. Steven [*sic*] Levin. She said she also has been experiencing pains in her shoulder and neck and has been diagnosed with arthritis in her shoulder and neck in the past. . . .

Knepper Cert., Ex. "F."

Dr. Chacko's report does not indicate that Dr. Hailoo advised him of the 2002 Incident. His diagnoses at that time included bilateral carpal tunnel syndrome; status post carpal tunnel release on the right with a recurrence of symptoms; and a history of cervical strain. See id.

Dr. Hailoo was again seen by Dr. Chacko for a second independent neurological examination on March 1, 2004. A related report prepared on the following day states that Dr. Hailoo's "past medical history is unchanged from the previous report," implying that she again failed to advise him of the 2002 Incident during this visit.

c. **Dr. Patrick E. Poole, M.D.**

On September 8, 2003, Dr. Hailoo was seen by one Patrick E. Poole, M.D., a physician whose area of practice is not identified. Although Dr. Poole wrote a one-sentence, unaddressed letter confirming that he saw Dr. Hailoo on this date, there are no substantive treatment records before the Court relating to this visit.

During his deposition in this case, Dr. Poole testified that Dr. Hailoo told him in 2003 that she believed the cause of her carpal tunnel syndrome was "the nature of her work." Knepper Cert., Ex. "K" at pp.7-8. In this regard, Dr. Poole testified that Dr. Hailoo did not tell him that she had suffered an injury. See id. at 7-8, 34 ("I was unaware that there had been an accident, so I obviously couldn't consider that as part of the explanation of her condition"). He further testified that while the continuing use of her hands as a practicing dentist could aggravate an existing case of carpal tunnel syndrome, "an accident, per se, usually would not explain carpal tunnel syndrome." Id. at p.36.

The Defendants rely upon paperwork submitted by Dr. Poole's medical office for reimbursement from the New York State Workers' Compensation Board following the September 8, 2003 office visit, and several subsequent visits. See Knepper Cert., Ex. "E." On these forms, the cause of Dr. Hailoo's injury is identified as "repetitive use of the upper extremities, as dentist, chronic reptetive [sic] hand activities, numbness, weakeness [sic], pain." Id. Although Dr. Poole testified in his deposition that he did not personally sign these forms, the description provided of Dr. Hailoo's physical activities "could certainly make carpal tunnel syndrome worse." Knepper Cert., Ex. "K" at p.13.

### 3. The Administrative Hearing

On or about April 19, 2004, a hearing was held before the New York State Workers' Compensation Board in connection with Dr. Hailoo's claim for Workers'

Compensation benefits. The transcript of this administrative proceeding is in the record as part of Exhibit "L" to the Lamson Affidavit.

On examination by a hearing representative for the New York State Insurance Fund, Dr. Hailoo gave the following testimony:

Q: When did this problem arise, Doctor?
A: When?
Q: When did you start having this problem, Doctor?
A: I have this problem since 2000. Beginning was in like April.
Q: April 2000?
A: Yes. I felt like my – after work I come home. Numbness, pain, tenderness, swelling my hands. Unbelievable. Very, very painful. Then I went to the neurologist. Dr. Pearl Richard.
Q: Richard Pearl.
A: I had EMG test. He told me you have carpal tunnel syndrome –

THE JUDGE: When was this?

*     *     *

THE CLAIMANT: It's in the report. I think it was in June 2000.

Id.

Subsequently, on examination by her attorney, John F. Clennan, Esq., Dr. Hailoo stated, in relevant part, as follows:

Q: After the surgery in 2000 did you return to work?
A: Yes, I did.
Q: And were you asymptomatic?
A: Yes.
Q: Do you know what the word "asymptomatic" means?
A: Yes.
Q: What does it mean?
A: Like I don't have the symptoms for the carpal tunnel syndrome.
Q: Could you bring us forward to March of 2002?
A: Yes. I was working fine and then March 2002 I was like – I don't remember exactly the name of the patient. I was doing extraction and I felt something and the tooth was broken. I couldn't finish it. I sent the patient to oral surgeon. I couldn't do it myself.

19

*     *     *

> THE JUDGE: Did you have a new incident involving carpal tunnel in March of 2002?
>
> THE CLAIMANT: This patient, I remember what I did for him.
>
> BY MR. CLENNAN:
> Q:   What the judge is asking you is:  Prior to March of 2002 were you asymptomatic?
> A:   Yes, I was asymptomatic.
> Q:   And after you treated this patient on March of 2002 what happened with respect to your wrists and your hand?
> A:   Okay.  All pain came back.  All symptoms came back of carpal tunnel syndrome including the left side, and severe.

Id.

Ultimately, based partly on this testimony, Dr. Hailoo's application was approved by the New York State Workers' Compensation Board and she received associated benefits.  See id.

## E.   The 2005-2008 Medical Consultations

### 1.   Dr. Mathew M. Chacko, M.D.

On May 31, 2005, and October 23, 2008, Dr. Hailoo again visited Dr. Chacko for independent neurological evaluations. In reports prepared shortly after these visits, Dr. Chacko again noted that the medical history provided by Dr. Hailoo on both dates was materially unchanged from her prior accounts, given in 2003 and 2004, again implying that she failed to advise him of the 2002 Incident during these visits.  See Knepper Cert., Ex. "F."

### 2.   Dr. Mark D. Epstein, M.D.

On May 3, 2007, one Mark D. Epstein, M.D. prepared a report relating to Dr. Hailoo's condition.  See Knepper Cert., Ex. "C."  The Court notes that Dr. Epstein's

20

report does not identify the date on which he examined Dr. Hailoo. His report, in relevant part, is as follows:

> The patient is a 58-year-old dentist who has currently been previously declared disabled from her practice of dentistry due to bilateral carpal tunnel syndrome. She has been seen by several doctors, underwent right open carpal tunnel release by Dr. Lawrence Hurst in July 2000 which worked for a couple of years and then the symptoms came back. She was working long hours and using her hands for a significant amount of repetitive use during the day. She was working 40 hours a week until October 31, 2002 when she stopped her practice. She is here because she is complaining of numbness in all fingers of both hands. She notes that splints help her, but she is still symptomatic. The left hand bothers her more than the right. She wakes up at night with numbness in her hands and occasionally sticks her hands in cold water to get relief. Her symptoms date back to July 2000. She has tried rest, splints, non-steroidals, vitamin B$_6$ injections and physical therapy, none of which have given her adequate relief. She notes she did not do a significant amount of repetitive activity at home while she was working as a dentist, only normal activities of daily living.

Id.

Again, it is noted that Dr. Epstein's report does not indicate that Dr. Hailoo advised him of the 2002 Incident. In addition, in paperwork submitted by Dr. Epstein for reimbursement from the New York State Workers' Compensation Board following the May 3, 2007 office visit, he identified the cause of Dr. Hailoo's injury as "[r]epetitive use bilateral hands." Knepper Cert., Ex. "D."

**3.    Dr. Andrea Coladner, D.O.**

On August 20, 2008, the Plaintiff was seen by Dr. Andrea Coladner, of South Shore Medical Care & Diagnostics, P.C. In a related report, Dr. Coladner wrote as follows:

The patient is a 60 year old right handed dentist who developed
bilateral carpal tunnel syndrome and in 2000 underwent right carpal
tunnel release. In 2002, she hurt her right wrist during man[.]
extraction and could not finish the procedure. She has been seen by
Dr. Epstein, Dr. Poole and Dr. Wani. She reports she has been unable
to work since 2002. The patient currently complains of bilateral hand
pain, painful movements, decreased movements, weakness, pins and
needles, numbness and difficulty sleeping.

Pl. 56.1 Opp., Ex. "E-1."

Dr. Coladner's impression was identified as "Bilateral Carpal Tunnel
Syndrome" and "Status Carpal Tunnel Release on the Right." Id.

Dr. Coladner was also deposed in connection with this action. The Court
notes that, in opposition to the instant motion, the Plaintiff submitted a one-page
excerpt of a transcript of an unspecified proceeding in which Dr. Coladner
apparently testified. See id., Ex. "H." Dr. Hailoo does not indicate whether this
one-page excerpt was extracted from Dr. Coladner's deposition transcript in this
case, or the date on which the testimony was given. The Court notes the following
exchange reflected in the transcript:

> Q: Isn't it true that even if she had an injury, the injury wasn't
> solely the cause of her disability or her carpal tunnel syndrome?
> A: Well, obviously according to the records she had the carpal
> tunnel syndrome before the injury, but she also had the surgery
> and was functional, so although it may not be the sole cause
> of . . .

Id.

Dr. Hailoo did not provide the Court with the page of the transcript on which
the final sentence continues.

However, an additional brief excerpt was provided by the Defendants in support of the instant motion. <u>See</u> Knepper Cert., Ex. "J." In that portion of the transcript, Dr. Coladner testified as follows:

> Q: [I]n your medical opinion, it's possible that [Dr. Hailoo's] bilateral carpal tunnel syndrome was caused by the utilization of vibrating tools and repetitive use of her hands, correct?
> A: Yeah, partial. I'm not going to say it's 100 percent because of that. My understanding of the sequence of events in this particular instance is that she developed bilateral carpal tunnel syndrome as a result of whatever you want to call it, repetitive injury, overuse at work and then in 2002 had an injury specifically relating to the right hand that aggravated or exacerbated or caused a recurrence of, whatever words you want to use, of the symptoms on the right hand. That's my understanding of what happened.

<u>Id.</u>, at p.20.

## F. The 2013 Notice of Expiration and the Plaintiff's Appeal of the Defendants' Coverage Determination

On June 6, 2013, DRMS sent a letter to Dr. Hailoo, advising her that her entitlement to benefits under the Policy would soon expire (the "Expiration Notice"). In relevant part, the Expiration Notice stated as follows:

> As you are aware, First Unum has been providing you with monthly Long Term Disability checks since 12/1/2002. The policy under which you have coverage has a maximum duration to age 65.

> Please be advised that your final check will be for the benefit period of 8/1/2013 to 8/14/2013 in the amount of $866.67.

Lamson Aff., Ex. "G."

Internal records maintained by DRMS indicate that on or about August 16, 2013, Dr. Hailoo contacted DRMS and contested the accuracy of the Expiration Notice. <u>See id.</u>, Ex. "H." In particular, apparently Dr. Hailoo contended that the

cause of her disability was an "accident," namely, the 2002 Incident, and therefore, under the terms of the Policy, she should continue to receive benefits for her lifetime. In this regard, the record contains notes created by one Danielle Hayes during a series of telephone calls with Dr. Hailoo, which reflect the following:

> [Claimant] called back and requested a copy of her policy as her WC [Workers' Compensation] lawyer stated it was an accident and not a sickness. Clmt stated she was performing an extraction in 2002 and heard a clicking in her right hand, as a result of that her right thumb no longer worked. Clmt also stated she was diagnosed w/ carpal tunnel syndrome but doesn't know how she got it. She stated she won her WC case on that claim it was listed as an accident.

Id.

During her deposition, Dr. Hailoo testified that, prior to receiving the June 6, 2013 Expiration Notice, she never advised DRMS that the cause of her disability was an accident, and not a sickness. See Knepper Cert., Ex. "G" at pp.117-18.

## G.    The 2013-2014 Post-Expiration Medical Consultations

### 1.    Dr. Shafi Wani, M.D.

On August 20, 2013, Dr. Hailoo again visited with Dr. Wani. The Plaintiff asserts that this visit was for the purpose of determining whether she should pursue a claim for coverage against First Unum. See Pl. Aff. ¶ 37. She was accompanied on this visit by her daughter, Deena Hailoo ("Deena"), who is a physician, and who also submitted an affidavit in opposition to the instant motion (the "Deena Aff.").

According to Dr. Hailoo and Deena, at the August 20, 2013 visit, Dr. Wani characterized the Plaintiff's condition as an "occupational disease." See Deena

Aff. ¶ 3; Pl. Aff. ¶ 38. However, because the Policy identifies disabilities as either accidents or sicknesses, Dr. Hailoo and Deena allegedly asked Dr. Wani to specify the category into which he believed the Plaintiff's condition would properly belong. See Deena Aff. ¶¶ 3-5; Pl. Aff. ¶ 38. In response to this question, Dr. Wani allegedly stated to Dr. Hailoo and Deena that the Plaintiff's condition could be considered an accident, which exacerbated her previous carpal tunnel syndrome. See Deena Aff. ¶¶ 4-5, 7; Pl. Aff. ¶¶ 39-40.

However, Dr. Wani's notes of this office visit reflect a different conclusion. In particular, in a related report, Dr. Wani noted as follows:

> The patient is here in the office today to discuss with me whether carpal tunnel syndrome constitutes an accidental disability or disease-related disability. The patient is accompanied by her daughter who is in the room.
>
> I explained to the patient that carpal tunnel syndrome cannot be classified as an accidental disability. Carpal tunnel syndrome is an idiopathic medical condition, which becomes symptomatic in most patients in their 40s and 50s, and is sometimes precipitated by physical activities of excessive wrist use. There is no documentation in my chart that this is an accidental disability.

Knepper Cert., Ex. "I."

These notes are consistent with the testimony that Dr. Wani gave during his deposition in this case. In particular, with respect to the visit from Dr. Hailoo and Deena, Dr. Wani stated as follows:

> Q: Why did you issue this report? Do you know why you issued this report?
> A: . . . There was something they wanted me to say which I couldn't say because, you know, I'm a licensed physician, I am responsible to the society and to the human race that you can't make statements which are not really medically correct. . . .

> They probably wanted me to call it an injury, so I told the
> two of them that I cannot call it an injury because carpal tunnel
> syndrome is not an injury, it's a disease. Whether it's caused by
> typing or dentistry, it's a condition and most of us don't believe
> that is has anything to do with occupation. We know that it's
> made worse by certain occupations, but people are born with
> carpal tunnel. . . .

Id., Ex. "H" at pp.32-33.

In sum, Dr. Wani stated that Dr. Hailoo's condition "is not an accidental
injury, it's an idiopathic condition." Id. at p.33.

### 2. Dr. Stewart Russell, D.O.

On September 17, 2013, DRMS referred Dr. Hailoo to a consultative
physician, one Stewart Russell, D.O., to review her file on behalf of the Defendants.
In a related report (the "Russell Report"), Dr. Russell noted that Dr. Hailoo's
attorney had "sent additional medical information" in support of her position that
"her previous carpal tunnel was basically healed and the injury in March 2002
caused her to have a new injury, not a re-injury." See Lamson Aff., Ex. "M." He
states that he had "been asked to review the file on appeal." Id.

After outlining Dr. Hailoo's medical history, as contained in various
treatment records, he concluded, in relevant part, as follows:

> [Dr. Wani] takes a history that the insured fell on her right hand with
> the thumb being hyperflexed and this would have been around 5/2002.
> She stated subsequently she had a recurrence of hand symptoms of
> pain, numbness and weakness. In her testimony provided by her
> counsel, she states she was extracting a tooth when her symptoms
> returned in 3/2002. There are two distinct stories regarding her
> increased symptoms, however there is no independent record of either
> of these occurrences resulting in office visits to a physician, urgent care
> or emergency room.

The insured stopped working on 10/30/2002, which would imply that she continued to work as a dentist, 7 months after the March 2002 "accident" or the May 2002 fall on her right hand. Assuming a significant "injury," it is unlikely that the insured would have had no evaluation, continued to work as a dentist for months, and then report multiple different histories of her symptoms increase to her attending physician and a workers' compensation judge.

In my opinion, there has been no accident or injury that led to an exacerbation or aggravation of her underlying carpal tunnel syndrome. This has been an extension of the same problem for which she had surgery in 2000.

Id.

Subsequently, on September 20, 2013, one Dana Coffin, a Managed Disability Consultant employed by DRMS, wrote a letter to Dr. Hailoo's attorney, John F. Clennan, regarding the Plaintiff's contention that the disabling event giving rise to her entitlement to benefits "was an accident which occurred in March 2002 when she was pulling a tooth." Id., Ex. "L."

Coffin stated that the Attending Physician's Statement previously provided by Dr. Wani had indicated that Dr. Hailoo's condition was a "sickness," and had noted diagnoses of "failed carpal tunnel surgery, right hand; mild left carpal tunnel syndrome; bilateral trapeziometacarpal joint dysfunction; and cervical disc diseases associated with cervical radiculopathy." Id. Coffin further stated that Dr. Russell reviewed the medical evidence "and agree[d] with [Dr. Wani] that the medical reasons she filed for disability was due to sickness." Id. Accordingly, Coffin advised Dr. Hailoo that, under the Policy, the duration of her benefits expired when she reached age 65; that the final benefit had been issued; and that her disability claim had been closed. See id.

### 3. Dr. Andrea Coladner, D.O.

On October 4, 2013, Dr. Coladner wrote a letter to the Plaintiff's attorney, John F. Clennan, stating, in relevant part, as follows:

> [A]n accident that occurs at work is to be considered an occupational injury. Though this event was "accidental" it none the less [*sic*] occurred at work, making it an accidental, occupational injury. If she were not performing the job duties of a dentist (i.e. pulling a tooth) she would not have sustained this injury. Therefore, I cannot claim this injury to be accidental and not occupational.

Pl. 56.1 Opp., Ex. "E."

The record is unclear as to what prompted Dr. Coladner to prepare this correspondence to attorney Clennan.

### 4. Dr. Patrick E. Poole, M.D.

On or about November 15, 2013, Dr. Poole also wrote a letter to attorney Clennan, which states, in relevant part, as follows:

> Mrs. Hailoo continues to be symptomatic as far as her hands are concerned. The nerve conduction velocities performed in this office confirmed the presence of a carpal tunnel syndrome, bilaterally, worse on the right at the present time. The onset of her disability was on this specific date [March 1, 2002]. There was no evidence of there being something before that at all.
> Consequently, it has to be concluded that the cause of her carpal tunnel syndrome is related to the accident of March 1, 2002.

Pl. 56.1 Opp., Ex. "F-1."

Despite the conclusion in this letter that Dr. Hailoo suffered an accident on March 1, 2002, Dr. Poole testified during his deposition in this case that there is no information in any of his office notes to confirm such an accident. <u>See</u> Knepper Cert., Ex. "K" at p.32.

## 5. Dr. George Pingian, M.D.

On November 26, 2013, one George Pingian, M.D., a doctor whose area of practice is not specified by the Plaintiff, but who apparently is affiliated with Mount Sinai Hospital, wrote an unaddressed letter. This letter stated, in relevant part, as follows:

> I am writing regarding Dr. Ogina Hailoo's disability as it relates to an accident on March 1, 2002. The history is that of an unusual series of forceful mechanical stresses applied to the hands and wrists as Dr. Hailoo performed an unusually demanding tooth extraction on a day when she had less assistance available. This one-time trauma constitutes a new injury process and resulted in this patient's inability to continue the physical demands of her work as a dentist. Prior to this, she was working in her usual dental practice with a chronic median nerve injury; hence it is my medical opinion that the injury sustained on the above date was the cause of her disability. This history of a particularly traumatic injury in a short space of time, distinguishes it from the usual work that preceded the above date of injury. It is reasonable to conclude that the occurrence of an acute injury on top of a chronic disease process is the proximate cause of this patient's disability. . . .

Pl. 65.1 Opp., Ex. "I."

## H. The Defendants' Final Coverage Determination

On December 12, 2013, Sandra Giordano, a Benefits Center Coordinator employed by Unum Group, the parent company of First Unum, conducted a telephone call with Dr. Hailoo. Giordano's notes of this conversation are in the record and, in relevant part, reflect the following: "Insured stated that she has a lawyer to have 1 of her DRMS claims diagnosis changed to Accident, as it is now sickness, as an accident claim continues longer." Giordano Aff., Ex. "D."

On January 2, 2014, Dr. Hailoo's attorney, Mr. Clennan, wrote a letter in response to Dana Coffin's letter of September 20, 2013, requesting that DRMS again reconsider the Plaintiff's claim for lifetime benefits. See Lamson Aff., Ex. "L." Presumably receiving no response, Clennan sent a follow-up request on January 26, 2014. See id.

On February 27, 2014, one Sandra Kaserman, a Senior Appeals Analyst employed by DRMS, wrote a letter to attorney Clennan in response to his requests. See id., Ex. "N." Kaserman advised Clennan that an additional evaluation of Dr. Hailoo's case had been completed and that DRSM would adhere to its original decision to deny her claim for benefits past the age of 65. See id.

## I.     The Instant Action

On March 28, 2014, the Plaintiff commenced an action against the Defendants alleging as follows: (i) the Defendants breached the terms of the Policy by discontinuing Dr. Hailoo's monthly benefits when she reached age 65, rather than continuing them for her lifetime (First Cause of Action); (ii) the Defendant DRMS violated Section 502(c)(1) of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(c)(1), by failing to provide the Plaintiff with certain required documentation relating to the Policy (Second Cause of Action); (iii) under Sections 501(a) and (g) of ERISA, Dr. Hailoo is entitled to past-due benefits under the Policy, together with prejudgment interest, reasonable attorneys' fees, and other equitable relief (Third and Fifth Causes of Action); and (iv) the Defendant DRMS's determination of coverage, namely, the denial of benefits to the Plaintiff after age

65, should be set aside as it allegedly is "arbitrary[,] capricious and an abuse of discretion" (Fourth Cause of Action).  The Court notes that the Plaintiff does not identify any state or federal statute pursuant to which the Fourth Cause of Action is brought.  Nor does she identify any common law theory of recovery.

On April 21, 2014, the Defendants served an answer substantially denying the Plaintiff's allegations.

On May 29, 2015, the Defendants filed the instant motion for summary judgment dismissing the complaint.

## II.     Discussion

### A.     The Applicable Legal Standards

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.'" Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998) (quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 26 (2dCir. 1998)).

"'[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

**B.     As to Whether Summary Judgment is Warranted on the Plaintiff's First Cause of Action Based on Breach of Contract**

Although the construction of an insurance contract is generally a question of law to be decided by the Court, in this case, the relevant terms of the Policy are clear and unambiguous.  The parties agree that the ultimate issue to be decided in this case is whether the event that rendered Dr. Hailoo disabled, and thereby entitled her to benefits under the Policy, was an "accident" or a "sickness," as those terms are defined in the contract.  In this regard, there is no dispute that, because Dr. Hailoo was under the age of 60 at all relevant times, if she is determined to have suffered from an "accident," she will be entitled to disability benefits for her lifetime.  By contrast, if she is determined to have suffered from a "sickness," then her benefits were properly terminated on her 65th birthday.

Under the plain terms of the Policy, whether Dr. Hailoo experienced an "accident" or a "sickness" turns on whether she endured a bodily injury that was "caused by an accident which . . . is independent of all other causes" (emphasis supplied).  Thus, for purposes of this motion, the issue is whether, drawing all inferences in Dr. Hailoo's favor, it can be said as a matter of law that the event which rendered her disabled occurred "independently of all other causes."

The Defendants contend that the medical evidence conclusively establishes that Dr. Hailoo suffered from carpal tunnel syndrome as early as 2000 and that, at most, the 2002 Incident aggravated the symptomology associated with her preexisting condition.  The Defendants contend that there is no evidence to support a finding that the bilateral carpal tunnel syndrome which rendered Dr. Hailoo

disabled is attributable solely to the 2002 Incident. Stated differently, the Defendants contend that there is no evidentiary basis for finding that the 2002 Incident was responsible for Dr. Hailoo's disabling condition, independent of all other causes.

Dr. Hailoo disputes this contention. She contends that she was asymptomatic during the period of time between her July 2000 carpal tunnel surgery and the 2002 Incident. Therefore, it is her position that the 2002 Incident was a separate injury, independent of all other causes, including and especially her previous bout with carpal tunnel syndrome.

The Court finds that there is evidence in the record that is consistent with both viewpoints. Therefore, the Court finds that an issue of fact exists which precludes summary judgment.

In the Court's view, there is considerable evidence in support of the Defendants' position. For example, in her November 6, 2002 claim for disability benefits under the Policy, Dr. Hailoo indicated that her condition was due to a "sickness" and not an "accident." More particularly, Dr. Hailoo described her injury as "[c]arpal tunnel [s]yndrome . . . in both wrists, fingers, and palms." This is consistent with her testimony that, although only her right hand was allegedly injured in the 2002 Incident, the affliction of both hands by carpal tunnel syndrome is what rendered her disabled.

Further, she stated in the Claim Form that "[s]urgical and conservative treatment have failed to improve the symptoms because of the continued overuse of

the upper extremities at work and continued dental work." She did not make mention of the 2002 Incident on the Claim Form, and testified that, at the time she completed it, she did not believe the 2002 Incident was the cause of her disabling condition. Rather, she testified that she believed her symptoms were the result of carpal tunnel syndrome.

Despite referencing Dr. Hailoo's alleged fall in his treatment notes from August 5, 2002, Dr. Wani did not diagnose the Plaintiff with a traumatic injury resulting from an accident at that time. Nor did he mention the 2002 Incident in the "Attending Physician's Statement" that was submitted in support of Dr. Hailoo's claim for disability benefits. In fact, he testified that, over the course of 11 or 12 office visits in 2003, and 11 more visits in 2004, Dr. Hailoo never even told him that she thought her symptoms were the result of an accident suffered while extracting a tooth. He testified that, notwithstanding her alleged fall, in his professional opinion, the cause of her disability was carpal tunnel syndrome and that "carpal tunnel syndrome is not really caused by accident."

In a December 11, 2002 interview with Rachel Galena of First Unum, Dr. Hailoo identified her diagnosis as cervical disc disease and carpal tunnel syndrome. She advised Galena that she had release surgery two years earlier, and had gone "back to work" but "c[ould]n't function anymore" because "her physician ha[d] advised that she [had] nerve damage." Despite this reference to nerve damage, the minutes of the December 2002 interview do not indicate that Dr. Hailoo specifically advised Galena of the 2002 Incident. Moreover, Galena's notes indicate that she

reviewed the relevant Policy provisions with Dr. Hailoo and notified her that the maximum duration of disability benefits was to age 65. Dr. Hailoo testified that, prior to receiving the June 6, 2013 Expiration Notice, she never advised DRMS that the cause of her disability was an accident, and not a sickness.

During a January 9, 2003 in-person interview with Carol McNally, Dr. Hailoo reported that after surgery, she had a reduction in the amount of pain and numbness she experienced, but she never obtained full relief from her symptoms. Further, she informed McNally that, since her surgery, she had experienced an increase in symptoms in her left hand, namely, the opposite of the hand that was allegedly injured during the 2002 Incident. In fact, the McNally Report does not indicate that Dr. Hailoo advised her of the 2002 Incident.

On February 14, 2003, Dr. Hailoo's husband, a physician, contacted DRMS by telephone to inquire about the status of his wife's claim for disability benefits and stated that "his wife had failed surgery for carpal tunnel and currently has nerve damage." He did not mention the 2002 Incident at that time.

In her April 11, 2003 application for Workers' Compensation benefits, Dr. Hailoo stated that her injury occurred as a result of "repetitive injury from pulling tooth, drilling teeth, rotation, cleaning, vibration from vibrating tools, fillings, injections." She did not specifically identify the 2002 Incident as a potential cause.

Further, Dr. Levin's July 21, 2003 report does not indicate that Dr. Hailoo advised him of the 2002 Incident. On the contrary, Dr. Levin attributed the exacerbation of the Plaintiff's symptoms to "a period of markedly increased clinical

activity." Dr. Hailoo concedes this, testifying at her deposition that she advised Dr. Levin that the cause of her wrist pain was "unusual[ly] long hours" and "using both hands to grip instruments tightly with [her] wrist in a flexed position."

In a July 22, 2003 independent medical examination with Dr. Chacko, Dr. Hailoo again gave a medical history that she developed carpal tunnel syndrome as a result of repetitive use of her hand while working as a dentist. During this visit, and on three subsequent occasions, in 2004, 2005, and 2008, Dr. Hailoo failed to advise Dr. Chacko of the 2002 Incident.

According to Dr. Poole, Dr. Hailoo told him during a September 8, 2003 examination that she believed the cause of her carpal tunnel syndrome was "the nature of her work" and that she did not tell him that she had suffered a traumatic injury. However, in any event, Dr. Poole testified that while the continuing use of her hands as a practicing dentist could aggravate an existing case of carpal tunnel syndrome, "an accident, per se, usually would not explain carpal tunnel syndrome."

Moreover, in various paperwork submitted by Dr. Poole's medical office seeking reimbursement for office visits with the Plaintiff, he identified the cause of her injury as "repetitive use of the upper extremities, as dentist, chronic repteive [*sic*] hand activities, numbness, weakeness [*sic*], pain." Id.

Similarly, in a May 3, 2007 report, Dr. Epstein noted that Dr. Hailoo had been declared disabled due to bilateral carpal tunnel syndrome. He further noted that her pre-surgical symptoms returned because "[s]he was working long hours and using her hands for a significant amount of repetitive use during the day." Dr.

Epstein did not indicate that Dr. Hailoo ever advised him of the 2002 Incident. Similar to Dr. Poole, Dr. Epstein reported in paperwork to the New York State Workers' Compensation Board that the cause of Dr. Hailoo's injury was "[r]epetitive use bilateral hands."

Dr. Wani's notes from the August 20, 2013 office visit indicate that he advised Dr. Hailoo and her daughter, Deena, that carpal tunnel syndrome cannot be classified as an accidental disability and that there was no documentation in Dr. Hailoo's medical file that her condition resulted from an accidental disability. He gave consistent deposition testimony, stating conclusively that Dr. Hailoo's condition "is not an accidental injury, it's an idiopathic condition."

A September 17, 2013 report by Dr. Russell notes that there is no independent record of the 2002 Incident resulting in office visits to a physician, urgent care or emergency room; that Dr. Hailoo continued to work as a dentist for seven months after the 2002 Incident; and that, in his opinion, there had been no accident or injury that led to an exacerbation or aggravation of her underlying carpal tunnel syndrome. Rather, he stated that her current condition is simply an extension of the same problem for which she had surgery in 2000.

Similarly, in an October 4, 2013 letter, Dr. Coladner stated that she is unable to characterize Dr. Hailoo's condition as "accidental and not occupational."

However, the Court notes that there is relevant evidence to support the Plaintiff's version as well. Principally, Dr. Hailoo asserts in her supporting affidavit that she made a full recovery from her 2000 carpal tunnel release surgery; that she

was thereafter asymptomatic; and that she returned to practicing dentistry without limitation. She asserts that the 2002 Incident occurred while she was extracting a patient's tooth.

Rather than immediately visiting a physician, Dr. Hailoo asserts that, following the 2002 Incident, she tried to ease her workload by hiring additional staff in the hopes that her symptoms would subside without medical intervention.

In his August 5, 2002 treatment notes, Dr. Wani specifically notes that Dr. Hailoo had "significant improvement in acute symptoms" following her surgery until about three months earlier, when she "fell on her right hand with the thumb being hyperflexed during the trauma" causing a "recurrence of hand symptoms of pain, numbness and weakness."

At her April 19, 2004 hearing before the New York State Workers' Compensation Board, on examination by her present attorney, Dr. Hailoo testified that, prior to March of 2002, she was asymptomatic. However, she further testified that, after the 2002 Incident, all of her pre-surgical symptoms returned, including severe symptoms on her left side.

In an August 20, 2008 report, Dr. Coladner noted that, in 2002, Dr. Hailoo had injured her right wrist during a manual tooth extraction and could not finish the procedure. However, in her deposition testimony, Dr. Coladner testified as to her understanding of the relevant events, namely, that Dr. Hailoo "developed bilateral carpal tunnel syndrome as a result of . . . repetitive injury, overuse at work and then in 2002 had an injury specifically relating to the right hand that

aggravated or exacerbated or caused a recurrence of . . . the symptoms on the right hand."

Further, in similar supporting affidavits, Dr. Hailoo and Deena both claim that, during an August 20, 2013 visit with Dr. Wani, he characterized the Plaintiff's condition as an "occupational disease," but indicated that the Plaintiff's condition could be considered an accident, which exacerbated her previous carpal tunnel syndrome.

In a November 15, 2013 letter, Dr. Poole stated, in part, that "[t]he onset of her disability was on" March 1, 2002 and that "[t]here was no evidence of there being something before that at all." He concluded that "the cause of her carpal tunnel syndrome is related to the accident of March 1, 2002."

Similarly, in a November 26, 2013 report, Dr. Pingian noted that "an unusually demanding tooth extraction" resulted in "an unusual series of forceful mechanical stresses applied to [Dr. Hailoo's] hands and wrists." He concluded that this "one-time trauma constitutes a new injury process" and "proximate[ly] cause[d]" her "inability to continue the physical demands of her work as a dentist."

At the summary judgment stage, it is not the province of a judge to weigh the evidence. Rather, the Court's task is simply to identify whether there exists a question of material fact to go to a jury. In this case, such a question plainly exists, namely, whether the Plaintiff's disability is the direct result of the 2002 Incident, which occurred independently of all other causes. On the record before it, the Court

finds that this question cannot be answered as a matter of law. Therefore, summary judgment is not warranted.

Accordingly, the Defendants' motion for summary judgment, to the extent it seeks to dismiss the first cause of action based on breach of contract, is denied.

**C. As to Whether Summary Judgment is Warranted on the Plaintiff's Second, Third, and Fifth Causes of Action Based on Violations of ERISA**

As noted above, in her Second, Third, and Fifth Causes of Action against the Defendants, Dr. Hailoo asserts various violations of the ERISA statute.

**1. Threshold Issue – Whether the Policy is an Employee Welfare Benefit Plan Within the Meaning of ERISA**

Before turning to the merits of the Plaintiff's claims in this regard, the Court must consider a threshold issue raised by the Defendants, namely, whether ERISA applies to the facts of this case.

The Defendants contend that ERISA is inapplicable here because the Plaintiff's disability insurance Policy is not an "employee welfare benefit plan," as that term is defined in the statute. Thus, according to the Defendants, the rights and remedies established under ERISA's statutory scheme are unavailable to Dr. Hailoo. The Court agrees.

Initially, a word about the legislative purpose of ERISA is appropriate. As one district court within this Circuit has explained:

> On September 2, 1974, after nearly a decade of examining the nation's private insurance and pension plans, Congress enacted [ERISA]. After this careful study, Congress found it necessary to provide safeguards for the establishment, operation, and administration of employee benefit plans. Congress passed ERISA to establish these safeguards,

intending that the statute would protect employees' contractually defined benefits and promote the interests of employees and their beneficiaries in employee benefit plans. According to Congress, ERISA implements these policies "by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect [to employee benefit plans], by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

Grimo v. Blue Cross & Blue Shield of Vt., 899 F. Supp. 196, 200 (D. Vt. 1995) (internal citations omitted).

As this statement of legislative purpose implies, "[t]he rights and remedies provided by ERISA may be invoked whenever a system of employee benefits meets ERISA's statutory definition of an 'employee benefit plan.'" Id. (quoting 29 U.S.C. § 1003(a)). Under the statute, an "employee benefit plan" can be either an "employee welfare benefit plan" or an "employee pension benefit plan." This case involves the former variety, which is defined, in relevant part, as follows:

> [A]ny plan, fund, or program which [is] established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . .

29 U.S.C. § 1002(1).

The Defendants contend that the Policy at issue in this case does not satisfy this definition, and thus the rights and remedies sought to be enforced by Dr. Hailoo pursuant to ERISA are unavailable to her. The Court's consideration of this issue is guided, in substantial part, by an earlier case decided on similar facts, Rand v.

<u>Equitable Life Assurance Society of the United States</u>, 49 F. Supp. 2d 111 (E.D.N.Y.

1999) (Spatt, J.).

In that case, the plaintiff was a chiropractor who operated his own

chiropractic practice, first as a sole proprietorship, and eventually as a partnership

with one other person. The plaintiff and his partner purchased disability income

insurance policies from the defendant, the premiums for which they paid

themselves. Because they both purchased such policies, they were eligible and

received a discounted group policy rate from the insurance company. None of the

other seven employees of the chiropractic practice received disability benefits under

these policies. Thereafter, the plaintiff became disabled a filed a claim under his

disability income policy. However, the defendant disclaimed coverage.

The plaintiff in <u>Rand</u> filed an action in state court, seeking, among other

things, a declaratory judgment that he was entitled to disability benefits under the

relevant policy, and associated damages. The defendant attempted to remove the

matter to federal court, asserting, as Dr. Hailoo asserts in this case, that, to the

extent the plaintiff's claims involved entitlement to monthly benefits under

disability income insurance policies issued by the Defendant under a discounted

group rate, the plaintiff's claims were governed by the provisions of ERISA and

presented a federal question. Also, the defendant in <u>Rand</u> asserted that the

plaintiff's state law claims were pre-empted by ERISA, requiring dismissal.

The matter was assigned to this Court to determine, *inter alia*, whether the

facts of that case came within the ambit of ERISA. More particularly, the issue

confronted in that case, which is directly analogous to the issue presented here, was whether the plaintiff's disability income policy was an "employee welfare benefit plan" within the meaning of the ERISA statute. The Court answered that question in the negative.

In particular, relying on the case of <u>Slamen v. Paul Revere Life Insurance Company</u>, 166 F.3d 1102 (11th Cir. 1999) ("<u>Paul Revere</u>"), this Court noted that:

> the gist of ERISA's definitions of employer, employee organization, participant, and beneficiary is that a plan, fund, or program falls within the ambit of ERISA only if the plan, fund, or program covers ERISA participants because of their employee status in an employment relationship, and an employer or employee organization is the person that establishes or maintains the plan, fund, or program. Thus, plans, funds, or programs under which no . . . employees or former employees participate are not employee welfare benefit plans under Title I of ERISA.

<u>Rand</u>, 49 F. Supp. 2d at 116 (quoting <u>Paul Revere</u>, 166 F.3d at 1104).

As this language suggests, both the <u>Rand</u> and <u>Paul Revere</u> decisions found the notion of an "employee welfare benefit plan" to be inconsistent with that of a self-employed insured. In this regard, the <u>Rand</u> decision quoted extensively from the Eleventh Circuit's reasoning in the <u>Paul Revere</u> decision. This reasoning applies with equal force to the facts of this case:

> Slamen argues that the disability insurance policy he purchased from Paul Revere in 1985 was not an ERISA plan because he wholly owned the dental practice and was the only person covered under the disability insurance policy. Thus, by virtue of section 2510.3-3(c)(1) [of ERISA's interpretive regulations, which, *inter alia*, define the term "employee"], he argues that he could not be considered an employee for purposes of determining whether the disability insurance policy was an ERISA plan. We agree. Slamen's disability insurance policy covered only himself. No employees received any benefits under the plan and there is nothing in the record showing that the disability

insurance policy bears any relationship to the health and life insurance benefits that Slamen provides to his employees. . . .

Rand, 49 F. Supp. at 117 (quoting Paul Revere, 166 F.3d at 1105).

Ultimately, in the Paul Revere case, the Court of Appeals held that the disability insurance policy at issue was not an ERISA plan because all the benefits flowed to the owner. This Court ruled consistently with that decision, concluding in in the Rand case that the disability insurance policies at issue were for the sole interest and benefit of the plaintiff, and not his employees. Although the plaintiff's partner in Rand also purchased a disability insurance policy, he could not be considered an employee for purposes of ERISA, and none of the seven actual employees at the plaintiff's chiropractic practice were entitled to any benefits under his disability policy.

This reasoning is entirely consistent with the plain language of ERISA's interpretive regulations, which, as indicated above, expressly exclude from the definition of an employee "[a]n individual and his or her spouse" where the respective "trade or business . . . is wholly owned by the individual or by the individual and his or her spouse. . ." 29 C.F.R. § 251.3-3(c)(1); accord Perlman v. Fid. Brokerage Servs. LLC, 932 F. Supp. 2d 397, 409 (E.D.N.Y. 2013) ("[T]he DOL's regulations explicitly exclude benefit plans with no employee participants from ERISA's coverage, and this Court is not in a position to disturb the DOL's judgment").

Applying these principles, the Court finds that the Policy at issue in this case is clearly not an "employee welfare benefit plan," within the meaning of ERISA.

There is no dispute that Dr. Hailoo is self-employed and the sole owner of her dental practice. See, e.g., Pl. Aff. ¶ 9 ("Between 1992-2002, I was self-employed in my practice . . ."); Lamson Decl., Ex. "C" (identifying her employer on the Claim Form as "self-employed"); Pl. 56.1 Opp., Ex. "A-2" (identifying her employer on the application for the Policy as "self"). There also is no dispute that, despite having hired employees at her dental practice, Dr. Hailoo and her husband were the only two individuals entitled to disability benefits under the Policy. See id. (identifying her spouse as the only other intended beneficiary under the Policy).

In reaching this conclusion, the Court expressly rejects Dr. Hailoo's contention that ERISA should govern these claims because the parties manifested an intention that their relationship proceed in accordance with the statute. In this regard, the Plaintiff asserts that DRMS, at the demand of her counsel, reevaluated its prior coverage position to assess the merits of her 2013 claim that she be entitled to lifetime benefits for a disability which was caused by an "accident" and not a "sickness." Further, the Plaintiff asserts that ERISA's interpretive regulations require employee welfare benefit plans to provide reasonable procedures to appeal an adverse coverage determination. See 29 C.F.R. § 2560.503-1(b). Thus, according to the Plaintiff, because DRMS took a single specific action, namely, reevaluating an adverse coverage position, which, incidentally, is also contemplated by ERISA, DRMS should therefore be deemed to have consented to ERISA's entire comprehensive statutory scheme.

In the Court's view, this position is untenable as a matter of law. There is nothing in the record to support a finding that DRMS consented to be bound by ERISA's statutory framework. Nor has Dr. Hailoo identified any relevant authority for the proposition that an insurance carrier becomes bound by federal legislation when it independently performs an act that happens to be required by the statute, under different circumstances. The Court's legal research has revealed no controlling case law to validate this position.

Under the authority of <u>Rand</u> and <u>Paul Revere</u>, the undisputed facts of this case fail to give rise to a claim under ERISA. Accordingly, the Court grants summary judgment with regard to the Plaintiff's Second, Third, and Fifth Causes of Action, and those claims are hereby dismissed with prejudice.

Accordingly, the Defendants' motion for summary judgment, to the extent it seeks to dismiss the Second, Third, and Fifth Causes of Action in the complaint, is granted.

In this regard, the Court is not divested of its jurisdiction over this matter as a result of the ERISA-based causes of action, the basis for the Plaintiff's federal jurisdiction, being dismissed. The Court notes that the complaint specifically invokes diversity jurisdiction under 28 U.S.C. § 1332 as an alternative basis for jurisdiction. <u>See</u> <u>Talwar v. Staten Island Univ. Hosp.</u>, 14-cv-1520, 2015 U.S. App. LEXIS 7455, at *6-*8 (2d Cir. May 5, 2015) (reversing a district court's decision not to exercise jurisdiction over pendent state law claims where the complaint

specifically and independently invoked diversity jurisdiction in addition to federal question jurisdiction).

Further, the complaint satisfactorily alleges complete diversity among the parties and that the amount in controversy exceeds $75,000.  See Compl. ¶¶ 1-5, 40. Although, in their answer, the Defendants deny the allegation that First Unum is a foreign corporation with its principal place of business in Chattanooga, Tennessee, they do not affirmatively dispute the parties' complete diversity of citizenship, and there is no evidence in the record to create an issue of fact in that regard.

Accordingly, the Court will retain jurisdiction over this case consistent with principles of diversity jurisdiction under 28 U.S.C. § 1332.

## D.    As to Whether Summary Judgment is Warranted on the Plaintiff's Fourth Cause of Action

As noted above, Dr. Hailoo's Fourth Cause of Action alleges that DRMS's determination of coverage, namely, the denial of her disability benefits after age 65, should be set aside as it allegedly is "arbitrary[,] capricious and an abuse of discretion."  However, the Plaintiff failed to identify any state or federal statute pursuant to which this claim is brought.  Nor does she identify any common law theory of recovery.

The Defendants appear to treat the Fourth Cause of Action as invoking ERISA.  See Defs. Memo of Law at 19 ("Claims two through five of the Complaint allege causes of action under ERISA").  In this regard, there is no question that the Plaintiff was on ample notice that the Defendants sought to dismiss the Fourth Cause of Action.  In fact, the Defendants' moving papers make abundantly clear

that they consider the Fourth Cause of Action to be fatally defective because ERISA does not apply to the facts of this case.

Thus, in the Court's view, if Dr. Hailoo had intended for the Fourth Cause of Action to invoke some other statute, or a common law theory of liability – or even if she simply disagreed with the notion that the viability of the Fourth Cause of Action hinged directly on the applicability of ERISA – she easily could have so stated in an effort to save the claim from dismissal. However, in opposition to the motion for summary judgment, Dr. Hailoo does not in any way contest the Defendants' assertion that the Fourth Cause of Action is a claim arising under ERISA. Rather, she argues in support of that statute's applicability in this case. Under these circumstances, despite the ambiguity in the complaint, the Court is left with the conclusion that Dr. Hailoo concedes that the Fourth Cause of Action invokes ERISA. Consequently, in light of this Court's prior holding that ERISA is inapplicable to the facts of this case, summary judgment is appropriate on the Fourth Cause of Action and that claim is dismissed with prejudice.

The Court notes, however, that even if ERISA did apply here, the Fourth Cause of Action is pled so vaguely and in such conclusory fashion, that it would fail, as a matter of law. See Hoffman v. Herdman's, Ltd., 41 F.R.D. 275, 278 (S.D.N.Y. 1966) ("Vague and conclusory allegations . . . [are not] sufficient to forestall the award of summary judgment. The highly general assertions . . . buttressed by no specific facts or evidentiary data, are hardly the sort of concrete particulars which

the [1964 Amendments to the Fed. R. Civ. P.] sought to require" (quoting <u>Dressler v. MV Sandpiper</u>, 331 F.2d 130, 133 (2d Cir. 1964)).

Accordingly, the Defendants' motion for summary judgment, to the extent it seeks to dismiss the Fourth Cause of Action in the complaint, is granted.

### III.    Form of Papers

In closing, the Court advises the Defendants to review Local Civil Rule 11.1, which plainly requires all documents submitted for filing with the Court to "have at least one-inch margins on all sides." In an apparent effort to circumvent the page limits applicable to legal memoranda, the Defendants' opening brief and its reply contain obviously non-compliant and impermissibly thin margins.

The Plaintiff should also revisit Local Civil Rule 56.1. In this regard, "apart from the fact that it ignores the Rule's requirement that a statement be 'short and concise,'" Dr. Hailoo's 64-page submission in response to the Defendants' 56.1 Statement "is not limited to facts as to which it is contended that no genuine triable issue exists" – rather, it "is instead rife with opinions, legal arguments, and blatant conjectures that are clearly disputed in this litigation." <u>Cotterell v. Gilmore</u>, 64 F. Supp. 3d 406, 419 (E.D.N.Y. 2014) (Spatt, J.) (quoting <u>Sheppard v. Beerman</u>, 190 F. Supp. 2d 361, 363 (E.D.N.Y. 2002), <u>aff'd</u>, 317 F.3d 351 (2d Cir. 2003)).

The parties are cautioned that in the future, the Court will reject any papers that do not conform to the Federal Rules of Civil Procedure, the Eastern District's Local Civil Rules, and this Court's Individual Rules of Practice.

## IV.    Conclusion

Based on the foregoing, the Defendants' motion for summary judgment is granted in part and denied in part.

In particular, the Court denies the motion with respect to the First Cause of Action, based on common law breach of contract, which will proceed to a trial in the ordinary course.

However, the Court grants the motion with respect to the Second through the Fifth Causes of Action, each of which arises under ERISA, and dismisses those claims with prejudice.

It is **SO ORDERED.**

Dated:        Central Islip, New York
              November 25, 2015        */s/  Arthur  D.  Spatt*
                                       ARTHUR D. SPATT
                                       United States District Judge